## In re CALDWELL MACHINERY CO.

(District Court, W. D. Washington, N. D.   July 31, 1914.)

No. 5188.

1. BANKRUPTCY (§ 140*)—AGENCY CONTRACT—CONSIGNMENT OF GOODS—"CONDITIONAL SALE"—"CONSIGN."

Where claimants appointed the bankrupt claimants' agent for the sale of certain steam pumps, the contract providing that claimant should consign pumps to the bankrupt for sale in its territory, and that all pumps shipped to the bankrupt should be held strictly on consignment, subject to monthly reports of the consigned goods, and further provided for the return of goods to the consignor at the expiration of the contract period, the term "consign" meant that the title to the property should not pass to the bankrupt, and hence property so consigned, remaining in the bankrupt's possession, on the intervention of bankruptcy was returnable to the claimant; the contract not being within Rem. & Bal. Code Wash. § 3670, providing for the filing of contracts of conditional sale (citing Words and Phrases, vol. 2, pp. 1408–1410; vol. 2, p. 1449; vol. 8, p. 7612).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 139*)—SALES ON OPEN ACCOUNT—VESTING OF TITLE—RECLAIMING GOODS.

Where certain goods were sold by the claimant to the bankrupt on open account, the title vested in the bankrupt at once, and the relation of debtor and creditor created, so that on bankruptcy intervening the seller could not rescind the sale and recover the goods.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193, 198, 199, 210–219; Dec. Dig. § 139.*]

3. BANKRUPTCY (§ 279*)—SALE OF GOODS—LEASE CONTRACT—SURRENDER BY BANKRUPT'S TRUSTEE—PROCEEDS.

Claimant furnished the bankrupt certain gasoline engines under a lease contract providing that the engines were to be leased to the bankrupt for an indefinite period, subject to claimant's order, with an option to the bankrupt to purchase during the period at a specified price, the merchandise to remain the property of the claimant until the option was actually exercised by the bankrupt's paying the price in full.   After bankruptcy the claimant sold four engines to D., but instead of delivering from its own stock, directed the bankrupt's trustee to deliver the engines shipped

to the bankrupt to D., which through inadvertence or mistake he did. *Held*, that the trustee had no authority to deliver such property without proper authorization from the court and for a fair consideration, and hence D. was liable for the return of the engines to the trustee or for their value.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 419–424; Dec. Dig. § 279.*]

In Bankruptcy. In the matter of bankruptcy proceedings of the Caldwell Machinery Company. Application to review orders denying petitions of the Gardner Governor Company, Le Blond Machine Tool Company, and the Regal Gasoline & Engine Company, for reclamation of property in the hands of the trustee in bankruptcy. Confirmed except as to petition of the Gardner Governor Company and as to certain lathes consigned to the bankrupt by the Le Blond Machine Company.

Nelson R. Anderson and J. B. Power, both of Seattle, Wash., for Gardner Governor Co.

McClure & McClure, of Seattle, Wash., for Le Blond Mach. Tool Co.

Brightman, Halverstadt & Tennant, of Seattle, Wash., for Regal Gasoline & Engine Co. and Clarence G. Dunlap.

Corwin S. Shank and H. C. Belt, both of Seattle, Wash., for trustee.

NETERER, District Judge. On December 15, 1913, the Caldwell Machinery Company, a Washington corporation, was adjudged bankrupt. Subsequently petitioners endeavored to reclaim certain personal property in the possession of the trustee, which, it is alleged, had been consigned to bankrupts for sale under agency contracts, and that the title to the property remained in the consignors. The matter is before this court upon petitions of several of the consignors for a review of the respective orders denying to them the right of reclamation. Each petition will be taken separately.

### Gardner Governor Company.

[1] The record shows that on February 5, 1912, a written agreement was entered into between the Gardner Governor Company and the bankrupt, styled, "Agency Contract for Gardner Steam Pumps." Omitting the formal parts, this agreement provides:

" * * * Has this day appointed the party of the second part agent for the sale of Gardner Duplex Steam Pumps, for Western half of Washington, and agrees to refer inquiries received from the said territory to said party of the second part; and in consideration of such agency, which is hereby accepted, the party of the second part agrees as follows:

"First: To sell no other duplex pumps of the same type or class.

"Second: To diligently solicit trade in the said territory.

"Third: To receive and hold strictly on consignment all pumps so shipped by party of the first part and to make monthly reports of all such consigned merchandise on hand unsold.

"Fourth: To pay the freight on such consignments.

"Fifth: To store, protect and keep in good order such pumps without charge.

"Sixth: To pay all taxes of every kind assessed or levied on goods held on consignment; to keep such property insured in responsible companies for the Gardner Governor Company, so as to protect the said Gardner Governor Company against fire loss.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Seventh: To bear all expenses incident to recovery of any and all goods held on consignment that may be attached, detained or taken possession of by any process of law, on account of any claim held by others against party of the second part.

"Eighth: To report monthly such sales of pumps as may be made from said consigned stock, and to remit for such sales within thirty days from date of said report."

"Tenth: To make settlement for the pumps in one of the three following ways, provided at the end of the term party of the second part does not care to renew the agreement: (A) To purchase said pumps in accordance with clause nine. (B) Return all pumps to party of the first part at Quincy, Illinois, freight prepaid. (C) If the party of the second part does not wish to take advantage of any of the above plans of settlement, it is agreed that said party will provide storage for such Gardner Pumps on hand until they can be ordered away by party of the first part, provided, however, that the party of the first part will make some disposition of them within three months from the expiration of this contract.

"Eleventh: The term of this agreement shall be one year from date and to continue thereafter from year to year unless either party desiring to discontinue will notify the other of its termination in writing at least thirty days before any terminal date."

The contract was made upon a general blank form, in which the ninth paragraph was crossed out, which reads:

"To purchase all Gardner Steam Pumps remaining on hand unsold on Oct. 31st of each year at current prices, making payment for such purchase four months after date of bill with privilege of deducting 2% within 30 days."

No testimony was reported, but the matter was submitted to this court upon the certificate of the referee, which states that:

"It was made to appear that though the goods in question were upon consignment as between the claimant and the bankrupt, it was contemplated by and between the parties that the bankrupt should have the right to sell any or all of the goods as its own property and take pay therefor in its own name, remitting to the claimant the price agreed upon to be paid by the bankrupt for the respective articles."

It further appears from the certificate that the goods, so far as the public was concerned, were treated by the bankrupt as its own, and when sales were made of the same, pay or security was taken in the name of the bankrupt. There is no evidence in the record to show that the written contract of agency was ever changed, modified in any way, or the goods shipped under any other arrangement than that set forth in the agency contract. It is fundamental that in the interpretation of a written contract, if the language used is well understood and the contract is free from ambiguity, oral testimony cannot be admitted to vary its terms, nor can the conduct of one of the parties with relation to the contract be considered by the court with a view of the interpretation or modification. The intent of the parties must be determined by the language employed if this can be done.

In L. C. Smith & Bro. Typewriter Co. v. Alleman, 199 Fed. 1, on page 4, 117 C. C. A. 577, on page 580, the court said:

"It is a cardinal rule in the interpretation of contracts that, if the words or terms thereof are equivocal, the subsequent acts of the parties thereunder are admitted to show how the parties understood their contract. * * * 1 Beach on Contracts, 721, p. 875. However, where the contract is free from ambiguity, and its meaning is clear in the eye of the law, such mode of con-

struction is inadmissible. The practical construction of a contract adopted by the parties thereto will not control or override language that is so plain as to admit of no controversy as to its meaning. *In such cases the intent of the parties must be determined by the language employed, rather than by their acts.* 1 Beach on Contracts, 722, 877."

The language employed in the contract in the instant case is definite, explicit, and free from ambiguity.

The trustee claims the property by reason of the provisions of section 3670, Rem. & Bal. Code of Washington, which is as follows:

"All conditional sales of personal property, or leases thereof, containing a conditional right to purchase, where the property is placed in the possession of the vendee, shall be absolute as to the purchasers, incumbrancers and subsequent creditors in good faith, unless within ten days after taking possession by the vendee, a memorandum of such sale, stating its terms and conditions and signed by the vendor and vendee, shall be filed in the auditor's office of the county, wherein, at the date of the vendee's taking possession of the property, the vendee resides."

The agency contract was not recorded pursuant to the provisions of this section. It, therefore, becomes necessary to determine whether the "agency contract" is a contract contemplated by this section of the Washington statute, or is a simple bailment. To ascertain the relations of the parties, the contract must be construed as an entirety, and, in the light of all of its provisions taken together, the intent of the parties must be determined. A reading of the contract clearly defines the intent of the parties to be to enter into a "contract of agency," that the goods shipped to the bankrupt should be on consignment, and that title to the unsold goods remain in the consignor. The bankrupt contracted to sell the consignor's pumps exclusively; to diligently solicit trade in the territory assigned; to receive and hold strictly *on consignment* all pumps so shipped, and to make monthly reports of the consigned goods on hand unsold; and further provided for the return of the goods to the consignor at the expiration of the contract period, and that the bankrupt should insure the goods for the benefit of the consignor and pay all taxes, etc.

"The term 'consign,' as used in a commercial sense, carries a decided implication that the property consigned is not the property of the consignee. The invoice carries no implication of ownership; it being well understood that an invoice usually accompanies goods that are consigned to a factor for sale, as well as in case of purchase. Rolker v. Great Western Ins. Co., 4 Abb. Dec. (N. Y.) 76, 83." 2 Words and Phrases, page 1449.

"A consignment of goods for sale is ordinarily a bailment. The word 'consignment' does not imply a sale. *The very term imports an agency, and that the title is in the consignor.* Harris v. Coe, 71 Conn. 157, 41 Atl. 552, 554; Sturm v. Boker, 150 U. S. 312, 326 [14 Sup. Ct. 99, 37 L. Ed. 1093]; Rolker v. Ins. Co., 42 N. Y. 23." Words and Phrases, vol. 2, p. 1409.

To distinguish between a bailment and a conditional sale contract is sometimes difficult:

"A conditional sale implies the delivery to the purchaser of the subject matter, the title passing only upon the performance of a condition precedent, or becoming reinvested in the seller upon failure to perform a condition subsequent. It is not infrequently a matter of difficulty to accurately distinguish between a conditional sale and a bailment of property. * * * It is an indelible incident to a bailment that the bailor may require the restora-

tion of the thing bailed.  *  *  *  If the identical thing, either in its original
or in an altered form, is to be returned, it is a bailment.  *  *  *  In a con-
tract of sale there is this distinguishing test, common to an absolute and to
a conditional sale; that there must be an agreement, expressed or implied,
to pay the purchase price." Union Stockyards, etc., v. Western Land & Cat-
tle Co., 59 Fed. 49, 7 C. C. A. 660.

No element of a conditional sale is embodied in the contract in is-
sue. There is no agreement to buy; there is no agreement to pay any
price. There are none of the elements of bargain and sale.

The attorneys for the trustee contend that subdivision A of paragraph
10 of the contract, "To purchase said pumps in accordance with clause
nine," makes paragraph 9, which is eliminated from the contract, a
part of the contract, although stricken, and that that extends an op-
tion to purchase, and would give the contract the force of an option to
purchase, and bring it within the provisions of the Washington stat-
ute. Such contention cannot receive indorsement. The elimination of
the option to purchase clause gives double expression of the intent of
the parties to eliminate every phase of a conditional sale character,
and the provision of paragraph 10 with reference to paragraph 9 is
simply inoperative. The intent of the parties being clearly expressed
upon the face of the contract, the inquiry of the court ends there.

In Union Stockyards Co. v. Western Land & Cattle Co., supra, the
following language appears:

"The cause must therefore be determined by the construction to be placed
upon the contracts under which possession of the cattle was delivered to Hall.
In the solution of that question, we must search for the intention of the par-
ties, as it may be gathered from a reading of the entire instrument, and not
from any separate provision of it—the real design of the parties as dis-
closed by the whole contract."

In Metropolitan National Bank v. Benedict Co., 74 Fed. 182, 20 C.
C. A. 377, the court had under consideration a written contract entered
into between the Stern Company and the Benedict Company, which
was an agreement relating to the consignment of ready made clothing
at net prices as per memoranda, and provided for insurance of the con-
signment, and that no part of the consignment should remain unsold
nor unpaid for by February 1, 1895. The consignee subsequently as-
signed all of its goods to the Metropolitan Bank, including the goods
consigned, and the bank claimed that the transaction between the com-
panies constituted a sale, and claimed title to the goods. The court
said:

"The contract between the Benedict Company and the Stern Company
*  *  *  was not a sale, but a contract of factorage. The stipulations of the
contract are not appropriate to a contract of sale. If it was a sale  *  *  *
what concern was it of the Benedict Company when they were sold? When
one merchant sells goods to another" he "never requires the buyer to enter
into a covenant that he will sell the goods within a specified period. Such
a requirement is inconsistent with the dominion over property which absolute
ownership confers.  *  *  * "

The Supreme Court of the United States, in Sturm v. Boker, 150
U. S. 312, at page 326, 14 Sup. Ct. 99, at page 103 (37 L. Ed. 1093), in
considering a contract between Boker and Sturm, in which Boker was
to ship sundry arms on consignment and Sturm was to ship the goods

to Mexico, and if, after sale, there was a profit above the stipulated price, to divide it equally with Boker, Boker to stand the loss in case the goods were not disposed of, and Sturm to return all goods undisposed of to Boker, without charge, and Sturm was to insure the goods for Boker's benefit, and instead had the policy made out in his own name "for account of whom it might concern," said:

> "It is too clear for discussion or the citation of authorities that the contract was not a *sale* of the goods by the defendants to Sturm. The terms and conditions under which the goods were delivered to him import only a consignment. The words 'consign' and 'consigned' employed in the letters were used in their commercial sense, which meant that the property was committed or intrusted to Sturm for care or sale, and did not by any express or fair implication mean the sale by the one or purchase by the other."

And on page 329 of 150 U. S., on page 104 of 14 Sup. Ct., 37 L. Ed. 1093:

> "The true distinction is pointed out by Wells, J., in Hunt v. Wyman, 199 Mass. 198, 200 [85 N. E. 446], as follows: 'An option to purchase if he like is essentially different from an option to return a purchase if he should not like. In one case the title will not pass until the option is determined; in the other the property passes at once, subject to the right to rescind and return.'"

In Re Galt, 120 Fed. 64, at page 67, 56 C. C. A. 470, at page 473, the court, in determining whether a contract for the consignment of wagons was a bailment or conditional sale, said:

> "The distinction between bailment and sale is not difficult of ascertainment, if due regard be had to the elements peculiar to each. In bailment the identical thing delivered is to be restored. In a sale there is an agreement, express or implied, to pay money or its equivalent for the thing delivered, and there is no obligation to return. Sturm v. Boker, 150 U. S. 312 [14 Sup. Ct. 99, 37 L. Ed. 1093]; Union Stockyards, etc., v. Western Land, etc., Co., 59 Fed. 49 [7 C. C. A. 660]. The bailee may, however, by contract enlarge his common-law liability without converting the bailment into a sale. The real intent of the contracting parties must be ascertained from all of the provisions in the agreement which express the contract, bearing in mind always that in a bailment the bailor may require the restoration of the thing bailed, and in a sale, whether absolute or conditional, there must be an agreement, express or implied, to pay the purchase price of the thing sold. The test would seem to be, Has the sender the right to compel a return of the thing sent, or has the receiver the option to pay for the thing in money?"

In John Deere Plow Co. v. McDavid, 137 Fed. 802, at page 811, 70 C. C. A. 422, at page 431, the court, in determining as to whether a contract was one of agency or of conditional sale, said:

> "The contract in this case must be read in its entirety, and its construction is not to be gathered from any separate provision of it. It is upon the whole contract that we must search for the intention of the parties, and a careful scrutiny of the agreement before us, in the light of legal principles, compels us to the conviction that it must be held to be a contract of agency, and that the title to the goods in the hands of the implement company at the time of the adjudication in bankruptcy did not pass to the trustee."

This expression was used by the District Court of Missouri in consideration of a contract made with relation to section 3412, Rev. Stat. 1899, of Missouri, which is as follows:

> "In all cases where any personal property shall be sold to any person, to be paid for in whole or in part in installments, or shall be leased, rented,

215 F.—28

hired, or delivered to another on condition that the same shall belong to the person purchasing, leasing, renting, hiring or receiving the same whenever the amount paid shall be a certain sum, or the value of such property, the title * * * to remain in the vendor, lessor, renter, hirer or deliverer of the same, until such sum, or the value of such property, or any part thereof, shall have been paid, such condition, in regard to the title so remaining until such payment, shall be void as to all subsequent purchasers in good faith, and creditors, unless such condition shall be evidenced by writing, executed, acknowledged and recorded as provided in cases of mortgages of personal property."

In Re Columbus Buggy Co., 143 Fed. 861, 74 C. C. A. 613, the court in determining whether a contract was a bailment or a conditional sale, said:

"A contract between a furnisher of goods and the receiver that the latter may sell them at such prices as he chooses; that he will account and pay for the goods sold at agreed prices; that he will bear the expense of insurance, freight, storage, and handling; and that he will hold the unsold merchandise subject to the order of the furnisher—discloses a bailment for sale and does not evidence a conditional sale."

Walter A. Wood Mowing & Reaping Mach. Co. v. Vanstory, 171 Fed. 375, 96 C. C. A. 331, and In re Reynolds (D. C.) 203 Fed. 162, are to the same effect.

In Berry Bros. v. Snowdon (C. C. A.) 209 Fed. 336, Circuit Judge Ross of this district, in reversing the District Judge upon the construction of a contract with very similar provisions to the contract in the instant case, said:

"It will be seen from the foregoing statement that the proper disposition of the appeal depends upon the true character of the agreement between Berry Bros. and Graves & La Belle. The court below held that it constituted as to the creditors, if not an absolute sale, a conditional one, and that it was void as against the creditors because not recorded pursuant to a statute of the state of Washington requiring recordation of such sales. But we are unable to so regard the contract between the parties. We think it was not a sale of any kind. In more than one place in the agreement it is * * * stated that the goods were to be consigned for sale, which is an altogether different thing."

The trustee contends that Eisenberg v. Nichols, 22 Wash. 70, 60 Pac. 124, 79 Am. St. Rep. 917, is decisive of the issue in this case, and the decision there, being an expression of the Supreme Court of Washington upon the construction of a state statute, should obtain here. This action was based upon the custom which is alleged to exist among jewelers where a jeweler procures from a jobbing or wholesale house lines of goods on selection or memoranda, and the court said:

"And that these two words 'selection' and 'memorandum' have a distinct trade significance, and their meaning as understood in the trade, and, it is alleged, in this case, was understood by Nichols, is that goods can be ordered from which selection can be made, and that all can be kept, or a portion, or none, and, if any are selected and kept by the jeweler, he has either to agree upon the terms of the sale, or pay cash for the property kept; that the title of the goods thus sent remains in the sender until paid for, or until it is agreed what credit will be given, which credit is evidenced by bills showing the terms. The goods in question were obtained under this memorandum contract, and were marked 'memorandum' or 'memoranda,' which it is alleged and shown mean the same thing."

The court further said:

"The testimony in this case shows that the transaction falls within the words and spirit of the statute. It was a contract containing, in the language of the statute, 'a conditional right to purchase where the property is placed in the possession of the vendee'; and the evidence in this case not only showed that Nichols had a right to purchase this stock, but that he also had a right to sell the same."

The instant case is clearly distinguishable from Eisenberg v. Nichols, supra. In that case the goods were sent to the jeweler on selection or memorandum, with the privilege of selecting what he wanted and paying for them afterwards. It was not in any sense an agency contract or a shipment on consignment. I am of opinion that the bankrupt held the goods as bailee and not as purchaser or lessor under conditional sale contract, and that the order of the referee denying reclamation was erroneous and should be reversed.

## Le Blond Machine Tool Company.

[2] The record and the certificate of the referee with relation to this claim shows that the goods were consigned without any written contract, and an examination of the correspondence leads to the inevitable conclusion that the 18x12, 12x8, and 14x8 lathes were sold and delivered to bankrupt on open account, the title at once vesting in the bankrupt, the relation of debtor and creditor at once obtaining, and that no basis for title in consignor exists, and it appears that the 14x6 and 20x12 lathes were sent to the bankrupt *on consignment* and come within the rule announced.

## Regal Gasoline & Engine Company.

[3] In this claim the material part of the lease or contract is comprehended in the following clause:

"To be leased to Caldwell Machinery Co. for an indefinite period and subject to the order of Regal Gasoline Engine Co. with an option to purchase during the period at the above mentioned price. Said merchandise to remain the property of the Regal Gasoline Co. until such option be actually exercised by paying in full for same."

It is contended by the petitioner that Rumpf v. Barto, 10 Wash. 382, 38 Pac. 1129, is decisive of the issue here, and that the holding of the referee should be reversed. On examination, it becomes apparent that that case is readily distinguishable from the instant case. In the Rumpf-Barto Case it is expressly stated that:

"Sale only takes effect from date of their [consignors'] approval of your selection"

—option being placed with the consignor as to whether the property should be delivered; whereas in the instant case the option is placed with the consignee, clearly bringing it within the provisions of the statute.

The trustee has filed a petition asking the return of certain property delivered to one Clarence J. Dunlap, agent of the Regal Gasoline & Engine Company, to which Dunlap has filed an answer. It appears that Dunlap purchased from the Regal Gasoline Company four en-

gines, but instead of delivering the engines from their stock, the Regal Company directed the trustee of the bankrupt to deliver four engines, shipped to bankrupt by them, to Dunlap. Upon request, the trustee, through inadvertence or mistake, turned over the four engines to Dunlap, and has filed this petition praying their return. It is contended by attorneys for the Regal Gasoline & Engine Company, who also appear for C. J. Dunlap, that Dunlap took these engines in good faith, paying full value therefor, and that the trustee should be estopped from claiming the property. It is sufficient to say that the trustee is an officer of the court of bankruptcy; that he gets his authority to act by virtue of the provisions of the bankruptcy act; that parties dealing with the trustee must be charged with knowledge of the duties and responsibilities devolving upon him and the source of his authority. Dunlap must know that he paid no consideration for the engines to the trustee; that the trustee, being an officer of the court, could not deliver any property belonging to the bankrupt estate without proper authority based upon fair consideration, and any payment made by Dunlap to others than the trustee was made at his hazard and risk. All of the parties are before the court, and Dunlap should be required to deliver to the trustee in bankruptcy the property belonging to the estate, and should be relegated to his arrangement with the Regal Gasoline & Engine Company to fulfill its contract for the sale of four gasoline engines.

The report of the referee is confirmed except as to the petition of the Gardner Governor Company, and the 20x12 and 14x6 lathes consigned to the bankrupt by the Le Blond Machine & Tool Company.

An order may be presented.